PARRO, J.
| ¡.Defendants, Argosy Gaming Company, Argosy of Louisiana, Ihc., Catfish Queen Partnership in Commendam, and Jazz Enterprises, Inc., appeal the final judgment entered in conformity with a jury verdict awarding damages to Capitol House Preservation Company, L.L.C. (Capitol House) arising from the defendants’ alleged misrepresentations and omissions made in pursuit of a riverboat gaming license. Capitol House has answered the appeal, asserting that the trial court erred in denying recovery to it for lost profits and in striking the damages the jury awarded to it for the cost of money it had borrowed in furtherance of its proposed riverboat gaming project. For the following reasons, we reverse. ¡
FACTUAL AND PROCEDURAL BACKGROUND
In 1993, the Riverboat Gaming Enforcement Division of the Gaming Enforcement *413 Section of the Office of State Police (the Division) had issued all but two of the 15 riverboat casino licenses authorized by the Louisiana Riverboat Economic Development and Gaming Control Act (Riverboat Gaming Act).[1] Three groups filed applications for the two remaining licenses, which were earmarked for Baton Rouge: 1) Lady Luck Baton Rouge, Inc. (sometimes referred to as “Lady Luck” or “Lady Luck Baton Rouge”); 2) Jazz Enterprises, Inc. (Jazz) and Argosy Gaming Company (sometimes referred to collectively as “Jazz/Argosy’), which formed Catfish Queen Partnership in Commendam (Catfish Queen)[2] and submitted a joint application as Jazz/Catfish Queen; and 8) Louisiana Casino Cruises, Inc. (LCC). The Division ultimately determined that all three applicants were suitable for a license.
The Division hired Perryman Consultants, Inc. to rank the applicants according to the economic impact that each would have on the local and state economies if | .^awarded a license. It ranked the Jazz/Argosy project first by a considerable margin, the LCC project second, and the Lady Luck project third. On July 18, 1994, after conducting hearings on July 7, 8, and 11, 1994, in which each applicant was afforded an opportunity to make a separate presentation, the Division awarded the licenses to Jazz/Argosy and LCC and denied Lady Luck’s application for a license.[3] The Division subsequently issued supplemental reasons for the denial of Lady Luck’s license. Lady Luck, which was owned by Lady Luck Gaming Corporation and Capitol House, did not appeal the Division’s denial of its license.
On July 10, 1995, Capitol House, as the successor-in-interest to Lady Luck, filed the instant suit in the 19th Judicial District Court against Perryman Consultants, Inc., and its president, Dr. Ray Perryman (sometimes collectively referred to as “Perryman”), alleging that Perryman committed numerous errors and omissions in ranking the applicants. On November 26, 1997, Capitol House amended its petition to name Jazz, Catfish Queen, Argosy Gaming Company, Argosy of Louisiana, Inc., and shareholders and principals of Jazz, including Steve Urie, Lodging Systems, Inc., Ronald Johnson, Mark Bradley, and Paula Bradley, as defendants. Capitol House asserted claims of negligence and violations of the Louisiana Unfair Trade Practices and Consumer Protection Law (UTPL), LSA-R.S. 51:1401, et seq. See LSA-R.S. 51:1409(A). Specifically, Capitol House alleged that Jazz and its principals made false and misleading statements to persons involved in the selection process regarding, among other things, the true ownership of Jazz and Jazz’s ability to finance and complete various landside improvements it promised.
Capitol House averred that Jazz’s material misrepresentations to the Division ■violated the Riverboat Gaming Act and disqualified Jazz from consideration for a license. Moreover, Capitol House asserted that the City of Baton Rouge’s support for the Jazz project, the issuance of a certificate by the Louisiana Riverboat Gaming | Commission (the Commission), the Perryman rankings, and the Division’s decision to issue a license were all based on *414 Jazz’s fraudulent and deceptive practices and representations. Capitol House alleged that Jazz, as a result of these representations, obtained an unfair and undue competitive advantage. Capitol House sought to recover the loss of its investments spent pursuing the license, the value of a gaming license, lost profits, and future lost profits of its business and riverboat project, as well as attorney fees and costs.
This case has an extensive procedural history and this court has written four prior opinions on appeal in this matter. In Capitol House Preservation Co., L.L.C. v. Perryman Consultants, Inc., 98-1514 (La.App. 1st Cir.12/10/98), 725 So.2d 523, writ denied, 99-0548 (La.4/9/99), 740 So.2d 637 (Capitol House I), this court upheld the trial court’s denial of a prescription exception as to the individual defendants, finding that the Riverboat Gaming Act imposed a continuing duty to report violations of the Act, and that each day the defendants, as licensees or applicants, failed to disclose the alleged misrepresentations, a new violation of the statutory duty arose and could constitute an unfair trade practice should the court so find. In Capitol House Preservation Co., L.L.C. v. Perryman Consultants, Inc., 98-2216 (La.App. 1st Cir.11/5/99), 745 So.2d 1194, writ denied, 99-3446 (La.2/11/00), 754 So.2d 937 (Capitol House II), this court reversed the granting of prescription exceptions, applying the continuing tort principle to find that the claims were not time barred against the remaining defendants.
In Capitol House Preservation Co., L.L.C. v. Perryman Consultants, Inc., 01-2524 (La.App. 1st Cir.12/31/02), 836 So.2d 680, writs denied, 03-0323 and 0324 (La.4/21/03), 841 So.2d 794 and 795 (Capitol House III), this court upheld the trial court’s denial of defendants’ exceptions raising the objections of lack of subject matter jurisdiction and no cause of action. With regard to the exception raising the objection of lack of subject matter jurisdiction, the defendants had asserted that the 1 strial court could not award damages to Capitol House, because it lacked original jurisdiction and authority to review the alleged misconduct and to determine whether applicants should have been awarded a riverboat license. This court disagreed, reasoning that the allegations in Capitol House’s petition asserted a civil claim for monetary damages arising from the alleged misconduct of defendants. Id. at 684. As no gaming agency had been granted the authority to award money damages, this court found that the case fell within the adjudicative sphere of the trial court. Id. at 685. With regard to the exception raising the objection of no cause of action, the defendants had argued that Capitol House was precluded from contesting the Division’s decision, because Capitol House had failed to exhaust administrative remedies provided for in the gaming law with respect to the denial of its license application. This court noted that the exhaustion doctrine applies only when exclusive jurisdiction exists in an administrative agency, and concluded that the doctrine did not apply to Capitol House’s claims for monetary damages. Id.
Following this court’s ruling in Capitol House III, the defendants filed exceptions raising the objection of res judicata, contending that Capitol House’s claims were barred because all issues raised by Capitol House had been previously litigated and determined by the Division during the licensing process. Because Capitol House’s predecessor, Lady Luck, had failed to appeal the Division’s rulings, the defendants submitted that those rulings were final and definitive and could not be collaterally attacked in court. In support of their assertion that all of Capitol House’s claims of misconduct were raised and addressed by *415 the Division, the defendants introduced complaints lodged with the Division by Capitol House’s predecessor, Lady Luck, the Division’s final order, and its reasons for ruling, as well as the transcripts of the hearings held before the Division. The trial court granted the res judicata exceptions, which judgment was affirmed by this court. Capitol House Preservation Co., L.L.C. v. Perryman Consultants, Inc., 03-1983, 03-1984 (La.App. 1st Cir.11/3/04), 889 So.2d 304, 312 (Capitol House IV).
On writs, the Louisiana Supreme Court reversed this court’s ruling, adopting the “reasons assigned by the dissenting judge.” Capitol House Preservation Co., L.L.C. v. Perryman Consultants, Inc., 05-0090, 05-0091 (La.3/24/05), 897 So.2d 584. The dissent reasoned:
First, although some of the issues in this lawsuit were raised at the licensing hearing before the Division, they were not litigated there. There was no opportunity for discovery, no filing of motions or exceptions, no cross-examination of witnesses for one party by representatives of another party, nor any of the other procedural aspects of a trial. Nor could there have been, as this court has previously held that at least some of the claims were in the nature of a continuing tort and, since no gaming agency was granted the authority to award money damages, those claims were beyond the jurisdiction of any such agency.
Second, even though LSA-R.S. 13:4231 now includes collateral estoppel, relitigation of the same issue is only precluded when the previous action was between the same parties. That aspect of res judicata has not changed. The licensing hearings were between each separate applicant and the Division, not between one applicant and another. Therefore, the licensing process and de-cisión cannot be res judicata as to the issues raised between these parties in this case.
Capitol House IV, 889 So.2d at 311-12.
This matter then proceeded toward trial. During the pre-trial process, the trial court granted the defendants’ motion for partial summary judgment, finding that the Riverboat Gaming Act precluded Capitol House from recovering any damages based upon the value of the license or the lost profits that would have been earned had the license been awarded. The trial court limited Capitol House’s damages to lost investments and expenses incurred in pursuit of the license. Before trial, Dr. Ray Perryman was dismissed through an exception raising the objection of res judica-ta. Later, defendants Steve Urie, Lodging Systems, Inc., Ronald Johnson, Mark Bradley, and Paula Bradley were voluntarily dismissed.
Capitol House proceeded to trial against the remaining defendants, Argosy Gaming Company, Argosy of Louisiana, Inc., Catfish Queen, and Jazz. The case 17was tried for eleven days to a jury, which rendered a verdict for Capitol House against all defendants in the amount of $3,823,786, consisting of $1,356,953 in costs incurred by Capitol House during the time period leading up to the denial of the license, as well as $2,671,000 of interest accrued from 1993 to the present on loans to Capitol House made by its member, Charles Lambert, Sr., and his brother, Laurence Lambert.[4] The jury found that the defendants violated the Riverboat Gaming Act by making material misrepresentations or omissions and that those violations constituted unfair and deceptive trade practices. It concluded that the Division would have denied defendants’ application for a gaming license had it been aware of the misrepre *416 sentations. The jury also found that Lady Luck would have been awarded a license had the defendants not received one.
Thereafter, the defendants filed a motion for judgment notwithstanding the verdict, asserting that the $2,671,000 interest award was not supported by the evidence as it was not documented by any note or loan agreement to Capitol House by either Charles Lambert, Sr. or Laurence Lambert. The trial court granted post-trial relief to the defendants by striking the conventional interest award. The final judgment signed on September 27, 2007, awarded Capitol House $1,356,953, together with judicial interest from the date of judicial demand, plus costs and attorney fees. Defendants timely sought and were granted a suspensive appeal. Capitol House has timely filed an answer to the defendants’ appeal.
BANKRUPTCY PROCEEDINGS AND THE AUTOMATIC STAY
On May 27, 2008, Capitol House notified this court that Argosy of Louisiana, Inc., Catfish Queen, and Jazz had commenced voluntary Chapter 11 bankruptcy proceedings in the United States Bankruptcy Court for the District of Delaware on May 5, 2008. Capitol House then filed a motion to sever and stay the appeal as to the bankrupt defendants. We note that 11 U.S.C.A. § 362(a)(1) extends the | Rautomatic stay provision only to the debtors filing bankruptcy proceedings and not to non-bankrupt co-debtors. See Martin v. David, 95-1411 (La.App. 3rd Cir.12/7/95), 666 So.2d 1136, 1137. Therefore, we recognize the automatic stay pursuant to 11 U.S.C.A. § 362(a)(1) as it applies to Argosy of Louisiana, Inc., Catfish Queen, and Jazz, and we are prohibited from deciding the issues presented on appeal as it relates to those parties until such time as the automatic stay has been lifted; however, no stay is in effect as to Argosy Gaming Company.[5] Because we are without authority to address any issue relative to the bankrupt defendants, we grant Capitol House’s motion, sever the appeal as to the bankrupt defendants, and stay that matter. We also grant. Capitol House an indefinite extension of time to file a reply brief as to the bankrupt defendants, to expire ten (10) days after Capitol House receives notice that the automatic stay has been terminated as to those defendants. Moreover, we grant Capitol House’s motion to file its reply brief as to Argosy Gaming Company only.' Accordingly, we limit the scope of our review in the underlying appeal to the defendant Argosy Gaming Company (Argosy).
ASSIGNMENTS OF ERROR
In this appeal, Argosy has presented the following assignments of error:
1. The defendants’ conduct in petitioning the Division and advocating for issuance of a gaming license is immune from attack under the UTPL pursuant to the Ñoerr-Pennington and Parker v. Brown federal antitrust immunity doctrines.
2. The trial court erred as a matter of law by not dismissing, on the basis of primary jurisdiction and failure to exhaust administrative remedies, that portion of plaintiffs claim that sought to overturn the licensing decisions and findings that were within the exclusive jurisdiction of the gaming regulators.
*417 3. Capitol House failed to prove that the defendants were disqualified from receiving a gaming license, that Lady Luck Baton Rouge was qualified, and that Capitol House was damaged by the denial of Lady Luck Baton Rouge’s license application.
|94. The trial court erred as a matter of law by failing to dismiss Capitol House’s claims on the grounds that defendants did not violate the UTPL, because the defendants were not engaged in “trade” or “commerce” as required under the UTPL.
Capitol House has answered the appeal and has presented the following assignments of error:
1. The trial court committed legal error by ruling that plaintiff could not recover lost profits due to the fraudulent and unlawful acts of the defendants as an element of damages under the UTPL or under LSA-C.C. art. 2315, thereby limiting plaintiffs recovery to out-of-pocket expenses incurred in the furtherance of its business.
2. The trial court committed legal error by striking the damages the jury awarded the plaintiff for the cost of money borrowed by plaintiff in furtherance of its proposed riverboat project and business, including $871,000 in accrued interest owed by plaintiff to Laurence Lambert.[6]
DISCUSSION
In its first assignment of error, Argosy asserts that the defendants’ conduct is immune from attack under the UTPL pursuant to the Parker and Noerr-Pennington immunity doctrines applicable in federal antitrust cases. The UTPL is a form of state antitrust statute patterned after the Federal Trade Commission Act, 15 U.S.C.A. § 41, et seq. See First Financial Bank, FSB v. Butler, 492 So.2d 503, 505 (La.App. 5th Cir.1986). The UTPL prohibits the same types of deceptive and anticompetitive conduct prohibited by the Federal Trade Commission Act. See LSA-R.S. 51:1405(A) and 15 U.S.C.A. § 45(a)(1). However, the UTPL permits “[a]ny conduct which complies with section 5(a)(1) of the Federal Trade Commission Act [15 U.S.C.A. § 45(a)(1) ],” as well as “any rule or regulation promulgated thereunder and any finally adjudicated court decision interpreting the provisions of said Act, rules and regulations.” LSA-R.S. 51:1406(4). Therefore, in interpreting Louisiana’s statute, a court must consider how the Federal Trade Commission and the federal courts have | inapplied the Federal Trade Commission Act to various types of conduct.[7] Among the antitrust law defenses recognized by the federal courts are the related Parker and Noerr-Pennington immunity doctrines, which have evolved from a series of United States Supreme Court cases interpreting the Sherman Antitrust Act, 15 U.S.C.A. § 1, et seq.[8]
*418 In Parker v. Brown, 817 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the United States Supreme Court held that the Sherman Act does not reach anti-competitive effects produced by official state action. The Supreme Court, assuming that the regulatory program before it would violate the Sherman Act if it were organized and made effective by private persons, validated the state’s actions implementing the regulatory program because:
It derived its authority and efficacy from the legislative command of the state and was not intended to operate or become effective without that command. We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature.
Parker, 317 U.S. at 350-51, 63 S.Ct. at 313. Argosy is clearly afforded no protection under the Parker doctrine, insofar as it protects state action in promulgating and enforcing anti-competitive legislation or rules.
Whereas the Parker doctrine applies to protect state action in governing anticompetitive regulation, the Noerr-Pen-nington doctrine applies to protect private persons’ efforts to procure governmental action. The Noerr-Pennington doctrine sweeps broadly and is implicated by both state and federal antitrust claims that allege anticompetitive activity in the form of lobbying or advocacy before any branch of either federal or state government. Kottle v. Northwest Kidney Centers, 146 F.3d 1056, 1059 (9th Cir.1998), cert. denied, 525 U.S. 1140, 119 S.Ct. 1031, 143 L.Ed.2d 40 (1999). The Noerr-Pennington doctrine applies to antitrust actions premised on state law. Video Intern. Production, Inc. v. Warner-Amex Cable Communications, Inc., 858 F.2d 1075, 1084 (5th Cir.1988), cert. denied sub nom., City of Dallas v. Video Intern. Production, Inc., 490 U.S. 1047, 109 S.Ct. 1955, 104 L.Ed.2d 424, and cert. denied, 491 U.S. 906, 109 S.Ct. 3189, 105 L.Ed.2d 697 (1989). Recently, the Louisiana Supreme Court has recognized that the doctrine can apply to actions brought under the UTPL. Astoria Entertainment, Inc. v. DeBartolo, 08-1690 (La.5/22/09), 12 So.3d 956.
In Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 136, 81 S.Ct. 523, 529, 5 L.Ed.2d 464 (1961), the United States Supreme Court held that the Sherman Act does not prohibit efforts to influence the passage and enforcement of laws, even where railroads disparaged trucking companies to customers and the general public, because such disparagement was “incidental” to petitioning the government to adopt laws allegedly destructive to the trucking business. Thereafter, the Supreme Court indicated that “Noerr shields from the Sherman Act a concerted effort to influence public officials regardless of intent [or] purpose.” United Mine Workers of America v. Pennington, 381 U.S. 657, 670, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626 (1965). Accordingly, efforts to influence public officials will not subject individuals to liability, even when the sole purpose of the activity is to drive competitors out of business. Id.
In Noerr, the court also recognized what has become known as the *419 “sham” exception. Under the “sham” exception, activity “ostensibly directed toward influencing governmental action” does not qualify for Noerr immunity if it “is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor.” Noerr, 365 U.S. at 144, 81 S.Ct. at 583. The “sham” exception to Noerr encompasses situations in which persons use the | ^governmental process— as opposed to the outcome of that process — as an anticompetitive weapon. City of Columbia v. Omni Outdoor Advertising, Inc., 499 U.S. 365, 380, 111 S.Ct. 1344, 1354, 113 L.Ed.2d 382 (1991). A “sham” situation involves a defendant whose activities are “not genuinely aimed at procuring favorable government action” at all, and not a defendant who “genuinely seeks to achieve his governmental result, but does so through improper means.” Id. The “sham” exception is inapplicable here, because the defendants, in attempting to obtain a gaming license, sought to procure favorable governmental action and were not attempting to interfere directly with the business relationships of their competitors.
The United States Supreme Court has also indicated that there is the possibility of a misrepresentation exception to the Noerr-Pennington immunity doctrine when the misrepresentations are made in less political arenas. See California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 513, 92 S.Ct. 609, 613, 30 L.Ed.2d 642 (1972) (“[m]isrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process”), and Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 500, 108 S.Ct. 1931, 1937, 100 L.Ed.2d 497 (1988) (“[b]ut in less political arenas, unethical and deceptive practices can constitute abuses of administrative or judicial processes that may result in antitrust violations”). Moreover, in Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 174, 86 S.Ct. 347, 349, 15 L.Ed.2d 247 (1965), the court concluded, without addressing or applying the Noerr-Pennington doctrine, that “the enforcement of a patent procured by fraud on the Patent Office may be violative of § 2 of the Sherman Act provided the other elements necessary to a § 2 case are present.”
The federal Fifth Circuit has also recognized that material misrepresentations made to government decision makers outside of the political arena are not protected |isby the Noerr-Pennington doctrine. In Woods Exploration & Producing Co. v. Aluminum Co. of America, 438 F.2d 1286 (5th Cir.1971), cert. denied, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972), the court held that the Noerr-Pennington doctrine did not protect the defendant producers’ filing of false production forecasts with a state regulatory commission. The forecasts were submitted by the producers themselves and the commission relied on the forecasts to set production limits. The Fifth Circuit noted that there was no opportunity for meaningful supervision or verification of the forecasts and they were adopted by the commission at “face value.” Id. at 1295. The Fifth Circuit stated that the Noerr-Pennington doctrine seeks to protect attempts to influence policies and held that “the abuse of the administrative process here alleged does not justify antitrust immunity.” Id. at 1298. The court drew a distinction between seeking to influence government policy versus seeking to undermine the policy altogether, noting as follows:
The germination of the allowable formula was political in the [Noerr] sense, and thus participation in those rulemaking proceedings would have been protected. But the formula’s subsequent implemen *420 tation is apolitical. Once the rule is promulgated, defendants may not plead immunity in their attempt to undermine its efficacy for anticompetitive purposes.
Id. at 1297.[9]
Argosy contends that more recent jurisprudence from the United States Supreme Court has significantly narrowed, if not closed altogether, any exception to Noerr-Pennington for fraudulent or unlawful conduct, including the exception recognized by the Fifth Circuit in Woods Exploration. In Omni, the Supreme Court indicated that it recognized the sham exception to Noerr-Pennington, but it would not recognize a conspiracy exception to the doctrine. The Supreme Court concluded that “with the possible market participant exception, any action that qualifies as state [14action is ‘ipso facto ... exempt from the operation of the antitrust laws.’ ” Omni, 499 U.S. at 379, 111 S.Ct. at 1353. Argosy contends that Omni stands for the proposition that the Supreme Court disfavored any across-the-board fraud exception. Argosy argues that so long as the sham exception is not applicable, it is immune from liability under the Noerr-Pennington doctrine.
Although Omni reflects the United States Supreme Court’s reluctance to carve out any additional exceptions to Noerr-Pennington immunity, we disagree that Omni necessarily limited the Fifth Circuit’s holding in Woods Exploration insofar as Omni involved a party’s efforts to influence the passage of zoning ordinances and did not involve any misrepresentations made to influence the administration of an existing rule or ordinance. Additionally, in Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc., 508 U.S. 49, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) (PREI), which was decided after Omni, the Supreme Court, after providing a two-part test designed for “sham” litigation, explicitly declined to decide whether immunity from liability would include situations where the litigant had perpetrated “fraud” or had made “other misrepresentations.” PREI, 508 U.S. at 61 n. 6, 113 S.Ct. at 1929 n. 6. Although given the opportunity to do so, the Supreme Court in PREI did not foreclose a misrepresentation or fraud exception to the Noerr-Pen-nington immunity doctrine when the misrepresentation or fraud occurred outside of the political arena.[10]
Recently, in Astoria, 08-1690 at p. 963, the Louisiana Supreme Court, noting that the United States Supreme Court “has chosen to cast a wide net of protection afforded by Noerr-Pennington” declined to extend the immunity to “protect illegal activity, especially in claims that arise outside of the scope of antitrust laws.” Therein, Astoria Entertainment, Inc. (Astoria), an applicant for a riverboat casino | ^license, filed an action against two other applicants, Edward J. DeBartolo, Jr. and *421 Robert Guidry, alleging that it was not awarded a license due to those defendants’ corrupt practices in, among other things, making illegal payments to former Governor Edwin Edwards in order to obtain Edwards’ assistance in having a casino license awarded to each of them. The defendants filed motions for summary judgment contending that their actions in seeking the licenses were protected by the immunity afforded under the Noerr-Pen-nington doctrine. The Louisiana Supreme Court found that the case fell outside of the scope of the antitrust laws and noted that the United States Supreme Court has never addressed the Noerr-Pennington doctrine outside of the antitrust context. The Louisiana Supreme Court further noted that the extension of Noerr-Pennington protection beyond antitrust cases by lower courts is based solely on the right to petition under the First Amendment, and those courts have eliminated the Noerr-Pennington doctrine’s first rationale for immunity — an interpretation of the Sherman Act. Id. at 963. The Louisiana Supreme Court found no reason to give the defendants’ illegal acts of bribery and corruption First Amendment constitutional protection, because those acts arose “outside of the scope of antitrust laws.” Id. at 964. As such, the court found that the defendants’ motions for summary judgment were improperly granted insofar as their acts were not immunized under Noerr-Pennington. Id.
Capitol House contends that Astoria is directly on point and should preclude the defendants from claiming Noerr-Penning-ton immunity arising from their alleged criminal acts. Capitol House notes that the trial court, in its jury instructions, identified the elements of the “crime of false statements relating to gaming” as set forth in former LSA-R.S. 4:558.[11] Capitol House also notes that the jury found that the defendants “knowingly and intentionally made materially false, untrue and/or | ^misleading representations in their application for a license in violation of the [Riverboat Act].” Given the severe penalties provided in former LSA-R.S. 4:558(B), Capitol House submits that the crime of submitting false statements in a license application is an illegal act and a serious criminal offense. As such, Capitol House concludes that under the rationale of Astoria, the Noerr-Pennington doctrine affords the defendants no protection arising from the criminal act of providing false statements in applying for their gaming license.
In Astoria, the Louisiana Supreme Court indicated that it would not expand the Noerr-Pennington doctrine to protect illegal activity, “especially in claims that arise outside of the scope of antitrust laws.” (Emphasis added.) Id. at 964. We note, however, that the primary claims asserted by Capitol House against the defendants arise under the UTPL. To the extent these claims fall under Louisiana’s antitrust statute, LSA-R.S. 51:1406(4) requires that we follow “adjudicated court decision[s] interpreting the provisions of [the Federal Trade Commission Act].”
The federal Tenth Circuit in Cardtoons, L.C. v. Major League Baseball Players Ass’n, 208 F.3d 885, 890 (10th Cir.2000), cert. denied, 531 U.S. 873, 121 S.Ct. 175, 148 L.Ed.2d 120 (2000), discussed the difference between immunity afforded under the Noerr-Pennington doctrine arising in the antitrust realm as *422 opposed to immunity that does not fall within the antitrust context and is based solely on First Amendment grounds. In that case, the court noted that the purpose of the Noerr-Pennington doctrine as applied in areas outside of the antitrust field is the protection of the right to petition. Id. at 889-90.[12] Although the right to petition is guaranteed, the right to petition is not an absolute protection from liability for the actions of the person exercising one’s right to petition. Id. at 891. Rather, the First Amendment’s right to petition does not grant immunity from suit for one’s actions 117and it protects from being enjoined only those petitions which are made to “the Government.” Id. at 892. In determining whether the person who exercised his right to petition is liable for his actions, a court must determine whether that petitioner violated the law. Id. at 890 n. 4. By contrast, antitrust cases that grant Noerr-Pennington immunity do so based upon both the Sherman Act and the right to petition. Id. at 890. Noerr-Pen-nington immunity is immunity from all liability, and a defendant is immune from liability based upon a simple showing of objective reasonableness. Id. at 890 n. 4. The court further cautioned about drawing constitutional principles from propositions founded upon construction of antitrust statutes. Id. at 891. Because the underlying case in this appeal arises under the UTPL, we must consider the immunity afforded under Noerr-Pennington in the context of the antitrust framework.
Misrepresentations, condoned in the political arena, are not necessarily immunized when used in the adjudicatory process. California Motor Transport Co., 404 U.S. at 513, 92 S.Ct. at 613. The alleged material misrepresentations in the underlying case were not designed to influence policy but rather to purportedly undermine the means of effectuating that policy. Such alleged abuse of the administrative process does not justify antitrust immunity if defendants’ alleged misrepresentations subverted the entire decision-making process to the extent that the Division was effectively no longer the real decision maker. See Woods Exploration, 438 F.2d at 1295; see also Kottle, 146 F.3d at 1063 (if misrepresentations made by defendant were of such a magnitude that the “entire [administrative] proceeding was deprived of its legitimacy,” then the sham exception to Noerr-Pennington would apply), and Cheminor Drugs, Ltd. v. Ethyl Corp., 168 F.3d 119, 123 (3rd Cir.1999), cert. denied, 528 U.S. 871, 120 S.Ct. 173, 145 L.Ed.2d 146 (1999) (material misrepresentations that “infect the core” of the defendant’s claim and the government’s resulting actions are not entitled to Noerr-Pennington immunity). On |isthe other hand, in a case involving the “conceded presence ... of disinterested decision makers, an independent investigation, an open process, and extensive opportunities for error correction,” the federal Third Circuit has affirmed, after consideration of the Noerr-Pennington doctrine, the dismissal of a lawsuit even though misrepresentations were made when an agency was acting judicially. Armstrong Surgical Ctr., Inc. v. Armstrong County Memorial Hosp., 185 F.3d 154, 164 (3rd Cir.1999), cert. denied, 530 U.S. 1261, 120 S.Ct. 2716, 147 L.Ed.2d 982 (2000).[13]
*423 The application of the Noerr-Pen-nington immunity doctrine is a question of law. See IGEN Intern., Inc. v. Roche Diagnostics GmbH, 335 F.3d 303, 310 (4th Cir.2003). As such, when addressing the Noerr-Pennington doctrine, a reviewing court conducts a de novo review of questions of law and renders a judgment on the record. See James Const. Group, L.L.C. v. State ex rel. Dept. of Transp. and Dev., 07-0225 (La.App. 1st Cir.11/2/07), 977 So.2d 989, 993. Accordingly, in order for Capitol House to have a viable claim under the UTPL that is not otherwise precluded under the Noerr-Pennington immunity doctrine, Capitol House must show that the defendants’ misrepresentations with regard to these issues subverted the entire decision-making process to the extent that the Division was effectively no longer the real decision maker. See Woods Exploration, 438 F.2d at 1295.
Capitol House submits that the evidence it presented at trial shows that Argosy would have been denied the license had the defendants not abused the administrative process and had the misrepresentations been known to the Division prior to the award of the license. In particular, Capitol House avers that it showed that the defendants: 1) concealed that Urie had a substantial ownership interest in Jazz, 2) failed to disclose contingent liabilities or agreements worth $3,2000,000, and 3) misrepresented Jazz’s ability to finance and build landside developments and, when | ^ Argosy acquired all of the shares of Jazz, performed a “bait and switch” scheme to defraud.
The Riverboat Gaming Act provided that the Division “shall not award a license or permit to any person” who is disqualified on the basis of a failure “to provide information and documentation to reveal any fact material to qualification, or the supplying of information which is untrue or misleading as to a material fact pertaining to the qualification criteria.”[14] On July 30, 1993, Jazz and Catfish Queen submitted a joint application (Application) for a license to the Division. The Application provided: “Disclosure of the information is REQUIRED. Failure to provide information could result in rejection or delay in processing this application.” The Application required that all owners of 5 percent or more be listed. In the Application, Jazz represented that Johnson, its president, and Bradley, its vice-president, each owned 50 percent of the company, while Urie was listed as a director of Jazz. As part of the Application, Jazz, through Johnson, submitted an “Affidavit of Full Disclosure” which stated “[t]hat, except as reported in Applicant’s/my Application (‘Application’), I have no agreement or understanding with any person or entity and no present intent to hold as agent, nominee, or otherwise any interest in the Application.” Additionally, the Application required that all contingent liabilities as well as all contracts or agreements pertaining to the gaming industry valued at $50,000 or more be disclosed. The defendants represented the value of all “Contingent Liabilities” as $0 in their Application. Jazz, through Johnson, executed a sworn “Verification” attesting “that the information contained in this Form is true, complete and accurate to the best of my knowledge and belief.”
*424 At trial, Capitol House contends it showed that Urie, who was not listed as an owner in the Application, concealed his ownership interest in Jazz during the licensing process. Capitol House called William R. Legier, a certified public 12naccountant and a certified fraud examiner, to offer expert testimony on the evidence of ownership, fraud detection, and forensic accounting. Based upon a review of multiple documents obtained from the defendants through discovery, including Urie’s individual returns, the corporate income tax returns, and corporate financial statements, Legier stated that Urie “had anywhere from a fifty to a seventy-five percent interest in Jazz from '98, February at least ... until the sale of his stock.” Legier testified that Johnson and Bradley, although listed as owners in the Application, “had no investment in the company, and they got very little out of it.” Legier concluded that Urie owned Jazz during the entirety of the licensing process. Moreover, Capitol House points out that Urie himself testified that “the worst thing you can do is be a supplier to casinos and then run a casino or to be part of the operations of a casino. So it was important that I not, particularly during the investigative stage, be a part of that, and we were very careful to make sure that I was distanced.” Capitol House concludes that it showed that Urie was effectively the owner of Jazz during the licensing process.
Also, Colonel Keith Norris, Deputy Superintendent for the Louisiana State Police and an adviser to the Division, testified that if anyone did anything to conceal from us, “we would have hit them on the head with a hammer.” Colonel Norris testified that if a party lied on its application in an attempt to deceive the Division or that it purposefully concealed ownership, then “it was over with for you.” Similarly, Commander Terry Landry, who was involved with the licensing process during the presentation stage, testified that “[i]f the intent of the applicant was not to disclose all the partners, it very well could have been a one strike and you’re out, or if it was an omission that wasn’t intentional, it could have been an administrative fine.” Based upon the foregoing testimony, Capitol House concludes that the defendants’ failure to list Urie as an owner abused the administrative process to the extent that the | ^defendants would not have been awarded a license had the Division known of Urie’s ownership interest in Jazz prior to the licensing hearing.
However, we note that Capitol House raised the specific issue regarding Urie’s ownership interest in Jazz during the course of the licensing proceedings. The Division investigated this specific allegation and was apparently satisfied with its findings insofar as it nonetheless decided to issue a gaming license to Jazz/Argosy. Moreover, although Urie was not listed as an “Owner” in the Application, the evidence presented at trial., indicated that the Division knew that Urie effectively controlled the ownership of Jazz insofar as ten months prior to the licensing hearing, the Division was informed that Urie held the option to buy 75 percent of Jazz for a nominal price. The Division was also aware that Urie was a principal in Jazz during the entirety of the licensing process insofar as he was listed as a “Director” in the Application. One of the main purposes for listing all principal officers, directors, partners, and stockholders was to allow the Division to perform background checks to make suitability determinations. The Division conducted the requisite background check on Urie as well as all other Jazz shareholders and determined that they were all suitable. The Division, after the license was granted, approved Urie’s exercise of the option. Because the Division knew that Urie was a *425 principal in, and effectively controlled, Jazz and because the Division performed the requisite background check on Urie, any alleged misrepresentation regarding Urie’s ownership interest in Jazz did not subvert the Division’s decision-making process.
Capitol House also contends that while the defendants indicated that they had no contingent liabilities worth at least $50,000, the evidence adduced at trial showed that the defendants failed to disclose contingent liabilities or agreements worth more than $3,200,000. First, Capitol House contends that Jazz concealed that it owed 122$2,200,000 to Peter Wilday, the architect for the Jazz project.[15] Although Jazz, in its Application, did not list the $2.2 million amount due Wilday, we note that it is undisputed that the Division, prior to the award of the license, became aware that Jazz owed this amount to Wil-day. As such, because the Division was aware of the amount owed to Wilday, the defendants’ failure to list the amount owed in the Application did not subvert the underlying decision-making process.
At trial, Capitol House also showed that Jazz, Urie, Johnson, and Bradley executed a settlement agreement with Randy Hayden, Jazz’s founder, in March 1993, which obliged Jazz to pay $50,000 to Hayden upon execution and to pay Hayden an additional $350,000 contingent upon a gaming license being issued to Jazz. Capitol House also showed that Jazz and Baton Rouge Gaming, Inc. (BRG) entered into an agreement on July 1, 1993, that provided if Jazz obtained a license and did not utilize BRG as its gaming operator, then Jazz would repay a $400,000 loan as well as an additional $250,000 to BRG. While the agreement between Jazz and Hayden should have been disclosed in the Application, we note that the settlement between Jazz and BRG was funded in the summer of 1993, or prior to the completion of the defendants’ financial statement, so the settlement was arguably not required to be reported. Nevertheless, even assuming that both settlements should have been disclosed, Capitol House failed to show that their exclusion was intentional. Additionally, the amount of the financial non-disclosures paled in comparison to the size of the entire project. Lieutenant Marcal Poullard, a member of the Division who was responsible for conducting suitability investigations of applicants and made the final decision as to who received the licenses, testified that the failure to list all contracts of $50,000 or more could affect the suitability of the applicant, but that he would not determine a proper course of action on his own. Accordingly, given that the Division was vested |awith discretion to decide what level of undisclosed debt the Division considered material for its licensing decision and because the debt paled in comparison to the totality of the proposed project, we cannot conclude that the defendants’ failure to list these contracts effectively removed the decision-making authority from the Division.
Capitol House also contends that the defendants misrepresented their ability to fund the proposed landside developments to Catfish Town. During the licensing process, the Division instructed the three competing license applicants to pro *426 vide information concerning the nature of the developments and the related costs of their proposed projects to Dr. Ray Perry-man, so that he could evaluate the economic impact of each. Perryman’s ranking, although not the sole determinative factor in deciding which applicants would receive a license, was given great weight by the Division.
Defendants, in a letter dated May 20, 1994, submitted financial information and projections of their proposed projects to Perryman and the Division. Defendants indicated that they would spend a total of $144.4 million, with Jazz spending approximately $97.2 million on the following land-side developments: $44.2 million to acquire and renovate Catfish Town by July 1995; $35 million to build a convention hotel with 400+ rooms by October 1995; and $18 million to build a special event/ sports center by July 1995. While Jazz committed to build these landside improvements in Phase I, Jazz could only borrow $18 million and could not obtain the financing necessary for completion of Phase I of the project -without Argosy’s agreement to modify a letter of intent between it and Jazz. Urie testified that Argosy refused to modify the letter of intent “a couple of months” before the licensing hearing. At that time, Jazz was running out of money and the parties unsuccessfully attempted to mediate the dispute at the end of June. At the time of the licensing hearing, Jazz could not obtain financing to complete the renovation of Catfish Town, to build the $35 million hotel, or to build the special event/sports center. Defendants l^did not disclose prior to or at the hearing that Argosy had refused to modify the letter of intent and that Jazz could not borrow any more funds to complete the project.
Four months after the defendants received the license, construction ceased on Catfish Town due to Jazz’s inability to pay the contractor. On December 2, 1994, the stockholders of Jazz entered into an agreement to sell 100 percent of their stock to Argosy for $27,000,000. Urie testified that Argosy misrepresented to Jazz that it would help Jazz to obtain the financing necessary to build the developments promised to the Division, thereby preventing Jazz from completing the project as promised. After Argosy took over the project, it significantly scaled back the renovation of Catfish Town and other landside developments that the defendants had promised to build, including the hotel and special event/sports center. Urie testified that Argosy built just “a fraction of what was initially promised.” Capitol' House concludes that had the Division known that the defendants could not secure the funding necessary to build the promised facilities, the defendants would not have been awarded a license.
We note that issues concerning Jazz’s ability to secure financing to build the proposed landside facilities were also raised during the course of the licensing process. Although the Division was unaware that Jazz and Argosy had disagreed over financing and the letter of intent months before the licensing hearing, the Division was aware of the allegations made against Jazz with regard to its ability to obtain financing. Cognizant of those allegations and as part of the application process, the Division reviewed the financial conditions of each of the applicants, including both Jazz and Argosy, as well as the economic impact of each proposal. While the internal strife between the two principals eventually led Argosy to purchase Jazz’s interest following the award of the license, the Division approved the sale of Jazz to Argosy, and Argosy eventually completed a scaled down Catfish Town project.
*427 | ^Although Jazz had difficulties obtaining the funding necessary to complete the landside developments as proposed and while Argosy ultimately scaled back the proposed landside developments, Perry-man, in ranking the three proposed projects, considered what might happen “realistically” as opposed to what each applicant promised. In ranking the Jazz/Argosy project number one by a considerable margin, Perryman indicated that he assigned a 65 percent chance to the likelihood that the hotel would be built, a 25 percent chance that the parking garage would be built, and almost no chance that the special evenVsports center would be built.[16] Even with the probabilities assigned by Perry-man regarding the defendants’ proposed facilities, Perryman testified that there was at least a 30 percent to 40 percent gap between the Jazz/Argosy project and the next closest competitor, LCC.[17] The Division relied heavily upon Perryman’s ranking in awarding the licenses, and Perry-man, in ranking the projects, took into consideration that many of the defendants’ proposals would never be built or would be scaled back. Consequently, the dispute over the financing agreement between the two principals or the failure to secure funds to build the landside developments as promised did not subvert the decision-making process.
We conclude that the defendants’ misrepresentations and/or omissions, when considered independently or collectively, did not subvert the Division’s decision-making process to the extent that the Division could not effectively evaluate the three proposed projects and make an informed decision as to which of the applicants should receive the two licenses. Moreover, our conclusion is further supported by the fact that the Division, an independent body of disinterested decision-makers, did not take all representations at face value and it had the opportunity to review and investigate the information submitted by the applicants.
IgfiCapitol House also asserts that in addition to its state law antitrust claims asserted under the UTPL, it has also raised state tort law claims, which would not be subject to the Noerr-Pennington immunity doctrine. We note, however, that Capitol House’s tort law claims based on allegations of intentionally false or misleading statements by the defendants to the Division are subsumed in the alleged violations of the UTPL.
To the extent that the tort claims could be considered outside of the antitrust context, we find that Capitol House has not met its burden of showing that the defendants’ acts rose to the level of criminality to satisfy the standard set forth by the court in Astoria. In the instant case, many of the alleged fraudulent and misleading statements were specifically addressed to the Division during the course of the licensing process, and the Division considered these allegations prior to making its licensing decision, as discussed above. The Division also had the authority to pursue and seek prosecution of the defendants if it believed criminal violations occurred during the course of the licensing process, but there is no evidence of record *428 that such action was ever undertaken.[18] By contrast, in Astoria, the defendants had been convicted for their criminal acts of bribery and corruption in securing their gaming licenses. As such, we do not consider any claims asserted under state tort law.
CONCLUSION
Accordingly, because the defendants’ misrepresentations did not subvert the entire decision-making process, we conclude that the Noerr-Pennington immunity doctrine affords Argosy immunity from liability under the UTPL. Moreover, we do not find that an independent cause of action exists under any other theory of recovery. Because we find the Noerr-Pennington immunity doctrine applicable in this case, we pretermit discussion of the remaining assignments of error. Therefore, the judgment is reversed. Each party is to bear its own costs associated with this appeal.
JajAPPEAL STAYED AS TO ARGOSY OF LOUISIANA, INC., CATFISH QUEEN PARTNERSHIP IN COMMEN-DAM, AND JAZZ ENTERPRISES, INC.; MOTION TO SEVER APPEAL AS TO BANKRUPT DEFENDANTS GRANTED; MOTION FOR INDEFINITE EXTENSION OF TIME TO FILE REPLY BRIEF AS TO BANKRUPT DEFENDANTS GRANTED; MOTION FOR EXTENSION OF TIME TO FILE REPLY BRIEF AS TO ARGOSY GAMING COMPANY ONLY GRANTED; JUDGMENT REVERSED.
PETTIGREW, J., concurs and assigns reasons.

. See former LSA-R.S. 4:525, which was re-designated as LSA-R.S. 27:65 by 1996 La. Acts, No. 7, § 3, 1st Ex.Sess.

. Argosy Gaming Company had a 90 percent ownership interest in Catfish Queen and Jazz had a 10 percent ownership interest in Catfish Queen.

.All citations to substantive laws throughout this opinion will be to those versions of such laws in effect as of July 18, 1994.

. The interest award was subject to a credit of $204,167.

. Beyond the automatic stay provisions of 11 U.S.C.A. § 362(a)(1), we note that 11 U.S.C.A. § 105(a) authorizes the bankruptcy court to stay proceedings against non-bankrupt defendants, but there is no evidence that the bankruptcy court has granted a stay in favor of Argosy Gaming Company.

. Capitol House also asserted that the trial court committed legal error in striking the accrued interest allegedly owed by Capitol House to Charles S. Lambert, Sr., but Capitol House has not addressed that assignment of error in its brief provided to this court, so we consider that issue abandoned. See Uniform Rules of Courts of Appeal, 2-12.4.

. See also Guste v. Demars, 330 So.2d 123, 125 (La.App. 1st Cir.1976), wherein this court, noting the similarities between the UTPL and the federal statute, indicated that "we may and should consider interpretations of the Federal courts and of the Commission relative to such similar statutes to adjudge the scope and application of our own statute.”

.The Sherman Act was adopted to provide against combinations or conspiracies in restraint of trade or commerce, the monopolization of trade or commerce, or attempts to *418 monopolize the same. D.R. Wilder Mfg. Co. v. Com Products Refining Co., 236 U.S. 165, 173-74, 35 S.Ct. 398, 401, 59 L.Ed. 520 (1915). The Federal Trade Commission Act was designed to supplement and bolster the Sherman Act and the Clayton Act. Federal Trade Commission v. Motion Picture Advertising Service Co., 344 U.S. 393, 394, 73 S.Ct. 361, 363, 97 L.Ed. 426 (1953).

. Similarly, in Kottle v. Northwest Kidney Centers, 146 F.3d 1056, the court indicated that misrepresentations made in an administrative-type proceeding are not protected by the Noerr-Pennington doctrine, but found that the allegations in the complaint were insufficient to avoid dismissal. Likewise, in Whelan v. Abell, 48 F.3d 1247 (D.C.Cir.1995), the court found that neither Noerr-Pennington nor the First Amendment protects the conduct plaintiffs alleged therein — namely, knowing misrepresentations to state securities administrators and a federal court.

. Moreover, the United States District Court for the Eastern District of Louisiana, in a case addressing the interplay between Louisiana’s regulation of casino gaming and the Noerr-Pennington and Parker doctrines, recently recognized the fraud exception as enunciated in Woods Exploration, but found it inapplicable therein. See Jebaco, Inc. v. Harrah's Operating Co., Inc., 2008 WL 638618 (E.D.La.2008).

. Louisiana Revised Statute 4:558 was re-designated as LSA-R.S. 27:99 by 1996 La. Acts, No. 7, § 3, 1st Ex.Sess. and later repealed by 2001 La. Acts, No. 1222, § 2, effective July 2, 2001. The latter act also enacted LSA-R.S. 27:30, a provision substantially similar to LSA-R.S. 27:99.

. The court also indicated that it is a bit of a misnomer to refer to the right to petition as the Noerr-Pennington immunity doctrine in a non-antitrust case. Rather, it is more appropriate to refer to the immunity' as Noerr-Pennington immunity only when applied to antitrust claims. Id. at 889.

. The majority in Armstrong distinguished the Fifth Circuit’s decision in Woods Exploration, 438 F.2d 1286, on the basis that the *423 regulators played no role in reviewing or approving the false data submitted to the state by the defendant.

. See former LSA-R.S. 4:536(A)(2), which was redesignated as LSA-R.S. 27:76(A)(2) by 1996 La. Acts, No. 7, § 3, 1st Ex.Sess. and later repealed by 2001 La. Acts, No. 1222, § 2, effective July 2, 2001.

. Wilday represented to the Division that he was "paid in full for [his] design and consulting services" rendered to Jazz and that he was paid $150,908.34. However, Capitol House notes that Jazz paid Wilday a total of $2,200,000 after Wilday represented to the Division that he was "paid in full.” Additionally, Capitol House questions whether Wilday had an ownership interest in Jazz, but the evidence presented at trial falls short of evidencing any ownership agreement between Wilday and Jazz.

. Jazz was only a 10 percent partner in the venture and bore no responsibility whatsoever to fund the cost of the riverboat and its dock.

. Perryman also testified that Argosy did eventually complete a modified form of the Catfish Town project. Although the hotel was substantially smaller than what was proposed and was built later than the anticipated deadline, Perryman indicated that the hotel Argosy actually built was approximately 65 percent of the size of the one proposed, so his firm "came pretty close on that one."

. Moreover, Capitol House has no right to bring a criminal action against defendants, and its right and/or cause of action in tort against the defendants is also questionable.